# W. T. WICK AND ANOTHER, *d.b.a.* WICK & STANSFIELD, v. CYRIL C. MURPHY AND ANOTHER.[1]

August 15, 1952.

No. 35,740.

[1]Reported in 54 N. W. (2d) 805.

*Morse & Frundt,* for appellants.
*Putnam & Spencer,* for respondents.

CHRISTIANSON, JUSTICE.

Action to foreclose a mechanic's lien for architectural services rendered to defendants by plaintiffs pursuant to contract. The trial court made findings and conclusions and ordered judgment for defendants. Plaintiffs appeal from an order denying their motion for a new trial.

Plaintiffs, W. T. Wick and L. H. Stansfield, both registered architects, are copartners doing business under the firm name of Wick & Stansfield at Mankato, Minnesota. Defendants, Cyril C. Murphy and Mary Helen Murphy, consulted plaintiffs in April 1949 with respect to remodeling their dwelling in Blue Earth, Minnesota. Preliminary conferences were held between the parties about the work to be done, and thereafter a contract dated May 4, 1949, was executed.

The contract in question appears to be a standard mimeographed form used by architects in making agreements with property owners for services. It did not specify the amount of the fee for the architectural services to be rendered nor estimate the amount the remodeling would cost. Following a recital of the purpose of the parties, the agreement sets forth the provisions material in the present case as follows:

"THE ARCHITECT agrees to perform for the above named work professional services in accordance with his 'Schedule of Professional Practice' attached hereto, with the following exceptions: [none listed].

"THE OWNER agrees to pay the Architect at the rate of Ten per cent (10%) hereinafter called the basic rate, computed and payable as stated in 'Schedule of Professional Practice', and to make any other payments and reimbursements arising out of said Schedule."

The "Schedule of Professional Practice," after an enumeration of the professional services to be rendered by the architect, reads, insofar as here material, as follows:

"2. The Architect's basic rate for such services, based upon the total cost of the work complete, is as mentioned in the agreement.

\* \* \* \* \*

"3. The Architect's complete services are proportioned as follows:

"(a) 25% covers preliminary sketches and cost estimates.

"(b) 45% covers working drawings, details and printing.

"(c) 5% covers specifications.

"(d) 10% covers approval of materials, selections of colors and fixtures and miscellaneous consultations; administration during construction.

"(e) 15% covers inspection and supervision of construction.

"4. Should the execution of any work designed or specified by the Architect or any part of such work be abandoned or suspended, the Architect is to be paid in the proportions of paragraph 3 (above) for the service rendered up to the time of such abandonment or suspension. Such payments will be due within 30 days after such abandonment or suspension.

"5. Payments to the Architect on his fee are made as follows:

"(a) Upon completion of the preliminary studies, a sum equal to twenty five per cent (25%) of the basic rate computed upon a reasonable estimated cost.

"(b) Upon completion of general working drawings and specifications, a sum sufficient to increase payments on the fee to sixty five per cent (65%) of the rate of commission as influenced by paragraphs 2a and 2b above, computed upon a reasonable estimated cost of the work on such completed specifications and drawings; or if bids have been received, then computed upon the lowest bona fide bid or bids. \* \* \*

"(c) From time to time during the execution of work and in proportion to the amount of service rendered by the Architect,

payments made on account of the fee reach a sum. equal to the commission, computed upon the final cost of the work.

\* \* \* \* \*

"8. When requested to do so, the Architect prepares or procures preliminary estimates on the cost of the work and he endeavors to keep the actual cost of the work as low as may be consistent with the purpose of the building and with proper workmanship and material, but no such estimate can be regarded as other than an approximation.

\* \* \* \* \*

"10. The words 'cost of the work' \* \* \* are ordinarily to be interpreted as meaning the total of the contract sums incurred for the execution of the work, not including Architect's and Engineer's fees, but in certain cases—e.g., when labor or material is furnished by the Owner below its market cost or when old materials are re-used—the cost of the work is to be interpreted as the cost of all materials and labor necessary to complete work, as such would have been if all materials had been new and if all labor had been fully paid at market prices current when the work was ordered, plus contractor's profits and expenses."

In accordance with the contract, plaintiffs prepared certain plans and specifications, which were submitted to defendants and approved on July 22, 1949. Defendants never requested, and plaintiffs never gave them, any estimate of the cost of the work. Four contractors were asked to submit bids on the work, but only one bid was received. It was for $14,959.80 and did not include certain work to be done on a cost-plus percentage basis. No evidence was produced at the trial as to the reasonableness of this bid. After being advised of the bid on August 12, 1949, defendants abandoned their plans to remodel, at least for the time being, for the reasons that the remodeling could not be completed that summer and that the only bid received was much greater than the amount they had planned upon and was considerably in excess of the limitation of expense they had orally communicated to plaintiffs. Thereafter, plaintiffs submitted their bill for services rendered based upon a

percentage of the bid price, giving defendants credit for $250 which they previously had paid. Defendants refused to pay the bill, and this action was subsequently instituted.

Plaintiffs claim that they are entitled to receive from defendants under paragraph "4" of the contract, above quoted, 75 percent of the amount determined by applying to the amount of the bid received the 10 percent specified in the contract.

On the theory that the written contract was incomplete and that it did not constitute an integration of the agreement between the parties, the trial court admitted parol evidence of limitations defendants placed upon the cost of the improvement and the time in which it was to be completed. The trial court specifically found that the true agreement made by the parties was that the cost of the improvement should not exceed $8,500 and that the plans and specifications therefor were to be completed so that the contract could be let and the remodeling completed prior to the fall of 1949. The court further found that plaintiffs had wholly failed to perform the agreement between the parties. Therefore, it ordered judgment in defendants' favor. In view of our conclusion that plaintiffs failed to establish a cause of action under the written contract, it is unnecessary for us to determine whether the contract as written constituted a complete integration of the oral stipulations of the parties or for us to pass upon the propriety of the trial court's findings with reference thereto.[2] Likewise, the questions raised by plaintiffs regarding time of performance[3] and waiver need not be considered in view of our determination on this appeal.

[2]Cf. Mitterhausen v. South Wisconsin Conference Assn. 245 Wis. 353, 14 N. W. (2d) 19.

[3]In this connection, however, it should be pointed out that where a contract is silent as to the time of performance the law implies that it is to be performed in a reasonable time; and, if it be in writing, evidence of a contemporaneous oral agreement is inadmissible to vary the construction to be thus legally implied from the writing itself. Liljengren F. & L. Co. v. Mead, 42 Minn. 420, 44 N. W. 306; American Bridge Co. v. American District Steam Co. 107 Minn. 140, 119 N. W. 783; 2 Dunnell, Dig. & Supp. §§ 3374, 3386.

■ As we interpret the written contract, the basic rate, upon which plaintiffs' fee depends according to the terms of the agreement, can be determined only after a construction contract has been let. Paragraph 2 of the Schedule of Professional Practice, which is part of the agreement, provides that the basic rate shall be based upon the total cost of the work complete, and paragraph 10 defines "cost of work" as the total of the contract sums incurred for the execution of the work. Since no construction contract was let, the basic rate cannot be determined in accordance with the contract, and thus 75 percent of that basic rate cannot be determined. Paragraphs 3 and 4, under which plaintiffs are claiming, say nothing about computing the percentages upon a bid rejected by the owner.

Paragraph 5(b), however, provides that upon completion of general working drawings and specifications payment shall be made of 65 percent of the rate of commission, computed upon a reasonable estimated cost of the work or, if bids have been received, upon the lowest bona fide bid. Reading paragraph 5 as a unit, it appears to contemplate that the work will be completed and merely to establish a schedule of partial payments on the whole fee at various stages of the work. Subdivision (b) provides a means of temporarily computing the basic rate for the purpose of making the partial payment due when the general working drawings and specifications are completed. Any variance of this temporary computation from the true basic rate as elsewhere defined in the contract would be corrected when the final computation of the total fee is made upon the cost of the work as provided by subdivision (c).

On the other hand, if subdivision (b) is read as applying where the work is not ultimately completed, it confuses the meaning of the contract rather than clarifying it. The contract then provides two basic rates, one based upon an estimated cost or the lowest bona fide bid, the other upon the contract price for the work. Where, as here, the terms of a written contract are uncertain and ambiguous and susceptible of more than one interpretation, parol

evidence may be introduced to show what was in the minds of the parties when the contract was made and the actual situation that then existed to the knowledge of both parties.[4]

Defendants were permitted to testify at the trial that they advised plaintiffs before the contract was executed that the cost of the proposed improvement could not exceed $5,000, and that this was later increased to $8,500 to include a new heating system which was added to the plans for remodeling their home. While plaintiffs conceded that there were preliminary discussions between the parties as to the cost and expense of remodeling as compared to the cost of building a new home, they denied that defendants ever placed any cost limitation on the work. The trial court in its findings obviously accepted defendants' version of the conversations between the parties in this connection. To aid the court in resolving the ambiguity apparent from the provisions of the contract itself, such parol testimony was clearly admissible.

■ Moreover, it is a well-established rule of construction that where a contract is open to two interpretations, the one more favorable to the party who did not draft the instrument should be adopted in the absence of a clear showing that a contrary meaning was intended by the parties at the time of its execution.[5] Since plaintiffs drafted the mimeographed form contract in question, defendants should receive the benefit of this rule.

■ If plaintiffs' interpretation of the contract were sustained, it would necessarily follow that they would be entitled to a fee based on the lowest bona fide bid received for doing the work called for by the plans and specifications prepared by them, regardless of the

[4]Wm. Lindeke Land Co. v. Kalman, 190 Minn. 601, 252 N. W. 650, 93 A. L. R. 1393; Kane v. Oak Grove Co. 221 Minn. 500, 22 N. W. (2d) 588; O'Connell v. Ward, 130 Minn. 443, 153 N. W. 865; Mather v. London Guarantee & Acc. Co. 125 Minn. 186, 145 N. W. 963; 2 Dunnell, Dig. & Supp. §§ 1817, 1817a, 3399, 3400.

[5]Wallace v. Joseph Dixon Crucible Co. 223 Minn. 162, 25 N. W. (2d) 465; Geib v. Haynes Corp. 185 Minn. 295, 240 N. W. 907; Lucas v. Ganley Brothers, Inc. 166 Minn. 7, 206 N. W. 934; Murray Cure Institutes Co. v. McClure, 110 Minn. 1, 124 N. W. 213.

amount of the bid or the letting of any contract. Such an interpretation is not to be lightly accepted and, in view of the parol evidence presented and the findings of the trial court, cannot be adopted here. The parol evidence discloses that in planning the remodeling of their home defendants were seriously concerned with the cost of the work; that it was an important factor in their decision to proceed with the remodeling rather than to build a new home; and that plaintiffs were aware of this fact.[6] The one bid for $14,959.80 which defendants received was 75 percent greater than the maximum cost limitation they had communicated to plaintiffs. This was so much in excess of the amount defendants had planned upon that they refused to go ahead with the remodeling. The specifications prepared by plaintiffs provided that "the Owner reserves the right to reject any or all bids * * *."

In view of the foregoing, it cannot be assumed that the parties intended, at the time the contract was executed, that plaintiffs were to receive a fee for their services based upon a rejected bid substantially in excess of defendants' maximum cost limitation. To construe the contract as meaning that plaintiffs were to receive their fee regardless of whether any contract was let or bid accepted would mean the practical elimination, as far as this case is concerned, of the paragraphs of the contract providing that the basic rate for the determination of the architects' fee was to be based upon the contract sums incurred for the execution of the work. Bearing in mind that the contract is to be construed most strictly against plaintiffs, we conclude that the "cost of the work" to be done is the only proper basis upon which to determine the architects' fee according to the contract between the parties.

This conclusion finds support in the interpretation given a similar contract by the Michigan court in the recent case of Loyal Order of Moose v. Faulhaber, 327 Mich. 244, 41 N. W. (2d) 535, involving

---

[6]On cross-examination one of the defendants was asked:

"Q. Did you think at that time that you probably would go over the eighty-five hundred dollars?

"A. I didn't know, I am not an architect or a contractor, but I wanted to warn them."

provisions practically identical with those in the contract between plaintiffs and defendants in the case at bar. The Michigan court, following its decision in Wetzel v. Roberts, 296 Mich. 114, 295 N. W. 580, held that a written contract for architect's services, containing no estimate as to the cost of the contemplated work, may not be construed as meaning that the architect was to receive his fee regardless of whether any work was done in remodeling a building where such a construction would mean the practical elimination of the clause of the contract prescribing the basic rate for the determination of his fee.

Plaintiffs do not rely on any claim of right of recovery for the reasonable value of the work actually done by them in defendants' behalf, and the record contains no testimony as to the actual value of such services. Therefore, it is unnecessary to determine whether plaintiffs would be entitled to any recovery on that theory.

In view of our decision that plaintiffs have failed to establish a cause of action under the written contract, we need not consider any of the remaining questions presented. The order of the trial court denying plaintiffs' motion for a new trial should be affirmed.

Affirmed.

MR. JUSTICE MAGNEY took no part in the consideration or decision of this case.