Charles UNTIEDT, et al., Appellants,

v.

GRAND LABORATORIES, INC.,
a South Dakota corporation,
et al., Respondents.

No. C3–96–590.

Court of Appeals of Minnesota.

July 30, 1996.

Review Denied Oct. 15, 1996.

Richard I. Diamond, Diamond, Liszt & Grady, P.A., Minneapolis, for Appellants.

James E. Malters, Von Holtum, Malters & Shepherd, Worthington, for Respondents.

Considered and decided by SHORT, P.J., and SCHUMACHER and FOLEY *, JJ.

## OPINION

SHORT, Judge.

This appeal involves a determination by the trial court that Charles and Wanda Untiedt (collectively Untiedt) executed a valid and unambiguous contingent fee agreement with Douglas E. Schmidt and Sieben, Grose, Von Holtum, McCoy & Carey, Ltd. (firm). On appeal, Untiedt argues the trial court: (1) made a clearly erroneous finding that the parties executed a valid agreement; (2) erred in concluding the 40˙ percent contingent fee unambiguously applies to an award of statutory attorney fees; and (3) committed plain error in basing its decision on irrelevant evidence.

## FACTS

After his original counsel withdrew from litigation involving the manufacture and sale of a defective cattle vaccine, Charles Untiedt met with attorney Schmidt concerning his willingness to assume responsibility for Un-

tiedt's case. Following ten hours of discussions, Schmidt dictated a retainer agreement, which provided:

> 3. In the event of a cash settlement or jury verdict, I agree to pay said attorneys from any money and or [sic] property paid, received, or collected by action, compromise, or otherwise, 40 percent of any recovery for attorney fees for handling my case to settlement or suit including appeal.

> \*   \*   \*   \*   \*   \*

> 5. I agree to pay for all the necessary costs and expenses incident to the performance of said services and the handling of said case, in addition to attorney fees, and after fees have been subtracted from my recovery. I agree that during the pendency of the action, I will advance and pay all costs relating to expert witnesses. Said firm agrees to advance and pay all other costs normally incident to the prosecution of a case such as this including court filing fees, deposition expenses, travel expenses, *et cetera*. It is agreed that all of the expenses advanced by both retainer and retainee will first be deducted from our recovery, and the remaining sum left after expenses will be split in accordance with the provisions of Paragraph 3 above. In the event there is no recovery, each party will bear their new [sic] expenses.

After requesting a typist to transcribe the agreement, Schmidt left the office without obtaining Untiedt's signature. When Untiedt signed the retainer later that evening, he added the following language next to paragraph 5:

> I have an objection to the first part of Paragraph # 5. I have signed this with the understanding that Paragraph # 5 will be corrected to our mutual agreement.

Untiedt then handed the agreement to the typist, who signed Schmidt's name on a line, under which she had typed "Douglas E. Schmidt by Jacqueline McKone."

For approximately three years, the parties acted in conformance with the retainer agreement; Untiedt paid the expert fees, and

---

\* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const.   art. VI, § 10.

Schmidt's firm advanced the remaining costs. When the litigation drew to a close, the parties could not agree on how to divide the proceeds, which included a $1,038,775 jury verdict and $366,584.24 in costs and attorney fees. Initially, no one disputed the firm's entitlement to 40 percent of Untiedt's recovery. Rather, the parties disagreed as to whether statutory attorney fees were part of the "recovery" under the retainer agreement. Thus, Untiedt remitted 40 percent of the jury verdict to the firm and placed the attorney fees into escrow.

When the parties found themselves unable to resolve the impasse, Untiedt requested the trial court to construe the retainer agreement. In his motion, Untiedt asserted for the first time that the document was invalid because his handwritten objection transformed the agreement into a counteroffer, which the night typist had no power to accept. Alternatively, Untiedt urged the trial court to declare paragraph 3 ambiguous and to construe it in his favor. While Untiedt never requested an evidentiary hearing, he submitted an affidavit stating: (1) he met with Schmidt for ten hours on June 2, 1992; (2) Schmidt offered to take the matter on a 40 percent contingent fee and to advance litigation costs except for expert fees; (3) Untiedt raised the issue of statutory attorney fees, after which Schmidt agreed to accept as payment *either* the 40 percent contingent fee *or* the statutory attorney fees, whichever proved to be greater; (4) Schmidt then dictated the agreement, but Untiedt did not hear him mention statutory attorney fees; (5) Untiedt expressed his concern about the fees, to which Schmidt responded they would appear in paragraph 5 of the agreement; (6) Schmidt then left the office; (7) Untiedt read the agreement, found no provision regarding the statutory fees in paragraph 5, and signed the document subject to his written objection; and (8) during the course of litigation, Untiedt made numerous requests for a corrected retainer agreement, but either was "put off" or received empty assurances.

By contrast, Schmidt's affidavit asserts: (1) Untiedt originally proposed a 33½ percent contingency fee, which Schmidt rejected; (2) Untiedt then suggested a 40 percent contin-

gent fee, which would not apply to a recovery under the Consumer Fraud Act; (3) Schmidt again declined the offer and explained he would take the case only if the 40 percent contingent fee applied to a recovery under the Consumer Fraud Act and Untiedt assumed responsibility for expert fees; (4) Schmidt memorialized his offer in a written retainer agreement, which Untiedt hesitated to sign; (5) Schmidt left the office because of a commitment, but allowed Untiedt to stay until he reached a decision and to return the document to the typist, who was authorized to accept it; (6) the following day, Untiedt explained he objected to the first part of paragraph 5, which suggests Untiedt would be responsible for paying the entire cost of litigation from *his* share of the recovery, while the last sentence more clearly provides for the deduction of costs from the *total* recovery, after which the parties would split the remainder according to paragraph 3; and (7) after Schmidt told Untiedt that the latter, specific language would govern their responsibilities for expenses, Untiedt gave his approval for Schmidt to proceed with the representation, which Schmidt did in reliance on the signed agreement.

At the close of the hearing on this motion, the trial court stated:

> The court will take the matter under advisement. I would note that irregardless [sic] of the decision this court makes, Mr. Untiedt is ahead of the game, so to speak * * * but the court will take this particular matter under decision * * *.

Two days later, the trial court issued a brief order, finding the existence of a valid and unambiguous retainer agreement, which entitled Schmidt and the firm to 40 percent of all monies received, including statutory attorney fees.

### ISSUES

I. Is the finding of a valid agreement clearly erroneous?

II. Did the trial court err in concluding that "recovery" unambiguously includes an award of statutory attorney fees?

III. Did the trial court commit plain error in basing its decision on irrelevant facts?

## ANALYSIS

This case requires us to decide whether the trial court erred in determining that the parties executed a valid contingent agreement, which unambiguously applies to an award of statutory attorney fees.

### I.

■ Because the existence of a valid agreement presents a question of fact, we will not disturb the trial court's resolution of this issue unless it is clearly erroneous. *See Malmin v. Grabner*, 282 Minn. 82, 86, 163 N.W.2d 39, 41 (1968) (noting "the existence of a contract is primarily a question of fact to be determined by the trial court"); *Herron v. Green Tree Acceptance, Inc.*, 411 N.W.2d 192, 195 (Minn.App.1987) (holding the existence of a contract presents a question of fact), *review denied* (Minn. Sept. 30, 1987); *see also* Minn.R.Civ.P. 52.01 (establishing the "clearly erroneous" standard for findings of fact).

■ Untiedt argues the trial court's finding of a valid agreement is clearly erroneous because his written objection transformed Schmidt's draft agreement into a counteroffer, which the typist had no power to accept. However, even these facts would not be fatal to the trial court's determination. The record contains evidence demonstrating: (1) the typist affixed Schmidt's name to the bottom of the agreement in both printed and written form; (2) Schmidt talked with Untiedt about his "counteroffer" the following day and secured Untiedt's agreement to proceed without revision of the language governing the division of costs; and (3) Schmidt considered the document to be a signed contract and operated under it for approximately three years. Because these facts would support a theory that Schmidt accepted Untiedt's "counteroffer" and adopted one of the previously-affixed inscriptions of his name as an authenticating signature, we cannot say the trial court's determination is clearly erroneous. *See* Restatement (Second) of Contracts §§ 134, 136 cmt. a (1979) (collectively authorizing the adoption of a previously-affixed symbol as an authenticating signature); 2 Arthur L. Corbin, *Corbin on Contracts* § 522, at 768–70 (1950) (same, and recognizing a party's conduct and surrounding circumstances as evidence of intent); *see also Conlan v. Grace*, 36 Minn. 276, 281, 30 N.W. 880, 883 (1886) (explaining a party may subscribe an agreement by adopting another's writing as an authenticating signature); *cf. National Fire Ins. Co. v. Commodore Hotel, Inc.*, 259 Minn. 349, 352–53, 107 N.W.2d 708, 710 (1961) (reviewing the record for the factual support of the trial court's single finding regarding the existence of a bailment agreement).

### II.

■ A contract is ambiguous if its language is reasonably susceptible of multiple interpretations. *Current Technology Concepts, Inc. v. Irie Enters., Inc.*, 530 N.W.2d 539, 543 (Minn.1995). Whether a contract is ambiguous presents a question of law, subject to de novo review. *See id.* (designating the inquiry as a legal question); *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n*, 358 N.W.2d 639, 642 (Minn.1984) (authorizing de novo review of legal issues). When faced with an ambiguous contract, we construe its terms against the drafter in the absence of a clear showing that the parties intended a contrary meaning. *See Current Technology Concepts*, 530 N.W.2d at 543 (generally requiring construction against the drafter); *Wick v. Murphy*, 237 Minn. 447, 453, 54 N.W.2d 805, 809 (1952) (authorizing derogation from the general rule upon a clear showing of the parties' contrary intent). Application of this rule is particularly appropriate when interpreting a contingent fee agreement. *See Cardenas v. Ramsey County*, 322 N.W.2d 191, 193–94 (Minn.1982) (recognizing the principle of construing ambiguous contingent fee agreements against their drafters, but relying on an attorney's sophistication and fiduciary status as the reason to favor an interpretation that comports with the client's expectations).

■ The term "recovery" is capable of multiple constructions. *Cf. id.* (recognizing

the word "recovered" could support more than one interpretation with respect to timing issues). It may involve "obtaining" a right or property by legal action, or it may suggest "regaining" something that has been lost, missing, or taken away. *Taylor v. Forte Hotels Int'l*, 235 Cal.App.3d 1119, 1 Cal.Rptr.2d 189, 192–93 (1991), *review denied* (Cal. Jan. 29, 1992). Thus, an attorney who enjoys an intimate familiarity with the text of Minnesota's private attorney general statute might conclude that a "recovery" includes an award of attorney fees. *See* Minn. Stat. § 8.31, subds. 1, 3a (1994) (allowing consumer fraud plaintiffs to *"recover* damages, *together with* costs and disbursements, including costs of investigation and reasonable attorney's fees") (emphasis added). However, even a sophisticated layperson probably understands only the general purpose of statutory fees, which is to require losing defendants to internalize the full cost of their wrongdoing and to provide winning plaintiffs with direct relief from the expense of litigation. *See Kirchoff v. Flynn*, 786 F.2d 320, 327 (7th Cir.1986) (describing fee awards in these terms); *Church of Nativity of Our Lord v. WatPro, Inc.*, 491 N.W.2d 1, 8 (Minn.1992) (explaining the attorney fees authorized by Minn.Stat. § 8.31, subd. 3a prevent attorney fees from depleting a plaintiff's damage award). Viewed from this perspective, Untiedt might reasonably have been surprised to learn that Schmidt expected to receive not only a percentage of traditional damages, but also part of the fund that was supposed to ease the burden of securing legal representation. *See Mahoney v. Sharff*, 191 Cal.App.2d 191, 12 Cal.Rptr. 515, 517–18 (1961) (involving a contingent fee agreement for 40 percent "of the amount recovered," construing the words against the drafting attorney, and concluding an award of fees did not constitute a "recovery" because it would give the attorney "fees for getting * * * fees"). Schmidt further expanded the potential for misunderstanding by making the fee contingent on "a cash settlement or jury verdict," which may have reinforced Untiedt's belief that the 40 percent fee applied to traditional measures of damages, but not to court-ordered fees.

▮ We have no doubt that an attorney may bargain for a percentage of both damages and fees, provided the overall compensation is reasonable. 1 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 1.5:104, at 100 (2d ed. 1990). However, the attorney must clearly provide for the intended division, perhaps by defining "recovery" to include an award of fees.[1] *See id.* n. 4 (stating the application of a contingency to an award of fees "should be done clearly"). While we agree that paragraph 3 of the retainer agreement contains some expansive language, other passages support Untiedt's construction of the agreement. In addition, Schmidt does not claim to have expressly defined his understanding of a "recovery." Given these facts, we conclude "recovery" is an ambiguous term and Untiedt is entitled to a construction in his favor. *See Wick*, 237 Minn. at 453, 54 N.W.2d at 809 (requiring construction against the drafter in the absence of a clear showing that the parties' had a contrary intent); *see also Cardenas*, 322 N.W.2d at 193–94 (applying a similar rule to a contingent fee agreement). Thus, we reverse the trial court and interpret "recovery" not to include an award of statutory attorney fees.

### III.

Untiedt further argues the trial court committed plain error by noting he was already "ahead of the game," which is irrelevant to an examination of the parties' intent. Because we reverse the trial court's construction of the term "recovery," we decline to address Untiedt's alternative prayer for relief.

### DECISION

First, the trial court's finding of a valid agreement is not clearly erroneous. Second,

---

1. It is appropriate for us to place the burden of identifying and clarifying ambiguities on the attorney, whose experience places him or her in a better position to discharge the task at the least cost. Moreover, it is consistent with the attorney's fiduciary status, which requires him or her to exercise great caution in the adverse process of selecting the terms that will govern a contingent fee arrangement. *See Cardenas*, 322 N.W.2d at 193–94 (interpreting the language of a contingent fee agreement in light of the drafting attorney's fiduciary status).

because Schmidt used "recovery" ambiguously and no evidence suggests a mutual contrary intent, we construe this term against him and reverse the trial court's conclusion that "recovery," as used in the parties' retainer agreement, includes an award of statutory attorney fees. And third, we decline to address Untiedt's remaining prayer for relief, which has been rendered moot by our construction of the agreement.

**Affirmed in part and reversed in part.**